**\*NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | Criminal No. 13-434 (FLW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| TYREEK M. HARRINGTON | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**WOLFSON, United States District Judge:**

On September 18, 2013, Defendant Tyreek M. Harrington ("Harrington" or "Defendant") was convicted by a jury of one count of possession of a firearm, specifically a 12 gauge semi-automatic shotgun, in violation of 18 U.S.C. § 922(g)(1). Defendant was acquitted on a second count of possession of a firearm, specifically, a .32 caliber revolver. Defendant now moves the Court to vacate the conviction and order a new trial under Rule 33 because of juror misconduct. For the reasons set forth below, Defendant's motion is granted.

## I.      BACKGROUND

The following is a brief summary of the Government's allegations. On April 20, 2012, New Jersey State Police and Trenton Police, working together, responded to information relating to a drug sale in Trenton, New Jersey. Upon arriving at the scene, Detective Blair Asbury, of the New Jersey State Police, observed an individual later identified as Harrington apparently in possession of a firearm and drug paraphernalia. The police arrested several individuals, including Harrington and another individual named Alton Powell, and, following an

1

investigation of the area, recovered, <u>inter alia</u>, two firearms—a sawed-off shotgun and a handgun.   Based on this incident, the Government brought charges against Harrington and Powell.   On June 28, 2013, a grand jury in Trenton, New Jersey, returned a two-count indictment against both Harrington and Powell.   Count One charged Harrington with possession of a firearm, specifically at JC Higgins, Model 66, 12 gauge semi-automatic shotgun, in violation of 18 U.S.C. § 922(g)(1).   Count Two charged both Harrington and Powell with another violation of § 922(g)(1), for possession of a F.I.E. Corp., Titanic .32 caliber revolver.   Prior to trial Powell pleaded guilty to Count Two.   Harrington proceeding to trial on September 16, 2013, during which the Government introduced testimony from New Jersey State Police Officers Blair Astbury ("Officer Astbury") and Alan Constance ("Officer Constance"), and Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Thomas Anthony Greco ("Agent Greco"), and produced the firearms charged in the indictment.   After the Government rested, Harrington called several witnesses, including Powell, but Harrington himself did not testify.   Both sides rested on September 17, 2013.   On September 18, 2013, the parties presented their closing arguments and the jury was charged; on that same day, the jury returned its verdict and Harrington was convicted only on Count One, that he violated § 922(g)(1) for having possessed the shotgun.   The jury acquitted Harrington on Count Two.   Defendant now moves the Court to vacate the conviction and order a new trial.[1]

## II.   LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."   Fed.

---

[1]   Defendant also filed a motion for judgment of aquittal pursuant to Fed. R. Crim. P. 29. My decision to vacate Defendant's conviction and order a new trial renders Defendant's Rule 29 motion moot, and thus I make no ruling in that regard.   Nevertheless, I note that some aspects of Defendant's Rule 29 motion are relevant in determining whether, under the circumstances, a new trial is warranted.

R. Crim. P. 33.   The authority to grant a new trial pursuant to Rule 33 is limited to those instances where the Court "believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."   United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (internal citations and quotation marks omitted); United States v. Silveus, 542 F.3d 993, 1004-1005, (3d Cir. 2008).   Even in those cases where the court may feel that the verdict is contrary to the weight of the evidence, "[m]otions for a new trial based on the weight of the evidence are not favored" and should be limited to "exceptional cases."   Silveus, 542 F.3d at 1005 (quoting Government of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)).   Yet if there is a reasonable possibility that a "trial error had a substantial influence on the verdict," a new trial must be granted.   United States v. Mastro, 570 F. Supp. 1388, 1390 (E.D. Pa. 1983); Government of Virgin Islands v. Bedford, 671 F.2d 758, 762 (3d Cir. 1982)).

### III.   DISCUSSION

Defendant was convicted of possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[2]   Defendant now moves for this Court to vacate the conviction and order a new trial based on juror misconduct.   Specifically, Defendant claims that one of the jurors admitted after trial that she had researched Defendant online following the voir dire and empanelment of the jury.   According to Defendant, this juror learned information about Defendant that was not presented during the trial, and was highly prejudicial to Defendant.   On this basis, Defendant

---

[2]      Section 922(g)(1) provides:

It shall be unlawful for any person—
(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

contends that a new trial is warranted in the interests of justice because of the high likelihood that this juror's misconduct tainted the jury's verdict.  The Government opposes Defendant's motion on the grounds that the misconduct was not prejudicial to Defendant.  The facts surrounding the juror's misconduct and the Court's post-trial inquiry are largely undisputed; I set forth those additional facts before proceeding to the merits of Defendant's motion.

On September 18, 2013, based on the testimony and evidence, the jury found that the Government had proved, beyond a reasonable doubt, that Harrington possessed the shotgun identified in Count One of the Indictment, but not the revolver identified in Count Two, and accordingly found him guilty of only one count of a violation of § 922(g).  On that same day, following the entry of the verdict and judgment against Harrington, I dismissed the jury.  On September 19, 2013, counsel for Defendant found an anonymous comment on an online news article that he believed indicated potential juror misconduct.  The comment, posted by "anonymous169" on a September 18, 2013 news article on the website "nj.com" regarding Defendant's conviction, and in response to another comment, stated:

> [Tyreek Harrington] is a well-known member of the Bloods, his uncle is one of the founders of the Trenton division. It was a JC Higgins Sears Roebuck 12 gauge.  He's in jail for other offenses and awaits trial for arrests that occurred since the one mentioned above.  I think he will be in for more than three years, but may not serve the full ten.
>
> Source: I was a juror.[3]

Defense counsel immediately informed the Court and the Government of the online comment, and requested that the Court allow for further investigation to determine whether one of the jurors from Defendant's trial had in fact posted this comment.  The parties agreed that the

---

[3]      The article can be accessed at http://www.nj.com/mercer/index.ssf/2013/09/trenton_ bloods_gangster_convicted_for_carrying_a_sawed-off_shotgun.html.      The comment by anonymous169 has since been deleted, but the parties agree that such a comment was posted with the above language.

information in the comment pertaining to gang affiliation and the Defendant being incarcerated on other arrests was information that was not presented at trial, and which the post's author could only obtain from extrajudicial sources.   In light of this, and given the post author's closing comment of "I was a juror," the Court granted Defendant's request to investigate.   Defense counsel was able to obtain the email address associated with the anonymous169 post, and with this information, the parties concluded that the author of the post was most likely Juror Six from Defendant's jury panel.  At this time, in order to preserve his rights, Defendant filed his Rule 33 motion for a new trial, which the Court held in abeyance until further investigation could be completed.

On November 16, 2013, at the request of defense counsel, the Court held an <u>ex parte</u>, <u>in camera</u>, and sworn interview of Juror Six, in the presence of the court reporter.   Relying on questions drawn up in consultation with the parties, and within the strictures of Fed. R. Evid. 606(b),[4] the Court confirmed that Juror Six was the author of the anonymous169 comment. When questioned about when and where she learned of Defendant's gang affiliation and other

---

[4]      Rule 606(b) governs the scope of questioning of a juror on the validity of a verdict, and provides in relevant part:

> (1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

> (2) Exceptions. A juror may testify about whether:

> (A) extraneous prejudicial information was improperly brought to the jury's attention;

> . . . .

Fed. R. Evid. 606(b).

arrests, Juror Six initially responded that she had done an internet search of Defendant's name only after deliberations had ended, the verdict had been entered, and the jury had been dismissed. However, when I asked again, Juror Six amended her prior answer, stating instead that she had actually first conducted an internet search of Defendant's name immediately after she had been selected for the jury panel, but before the Government had commenced its case-in-chief.  When I inquired what she learned from this search, Juror Six stated that she had only seen the headlines for news articles that had appeared in the search results, but that she did not click through the links for these articles or read them further.  She could not recall what headlines she may have seen pertaining to Defendant, but she did remember reading a headline referring to Defendant's uncle being a member of the Bloods.  Finally, I asked Juror Six if she had engaged in any other research—beyond her initial internet search the day she was selected and the search she conducted after deliberations had concluded—or whether she had shared this or any other extrajudicial information regarding Defendant with the other jurors, to which both questions Juror Six responded in the negative.  At this point, I concluded the interview.

Copies of the sealed transcript of the interview were provided to the parties, and the Court instructed the parties to brief Defendant's Rule 33 motion for a new trial based on Juror Six's <u>in camera</u> testimony.  In that connection, I informed the parties that I found Juror Six's testimony and demeanor during the <u>in camera</u> interview to evidence that, during the trial, "she knew of Defendant and his relative's reported involvement in a Trenton gang—<u>i.e.</u>, information that was not presented at trial."[5]  Defendant now argues that Juror Six's testimony—and this Court's determination—that she knew of Defendant's connection to a Trenton gang during

---

[5]     For that reason, I denied Defense counsel's request to conduct a forensic examination of Juror Six's computer or other internet-connected devices to determine whether she had conducted any additional research beyond what she described in her testimony, finding such an investigation to be unnecessary in light of my finding.

Defendant's trial is highly prejudicial, sufficient under the circumstances to warrant this Court vacating Defendant's conviction and ordering a new trial.  In response, the Government contends that even assuming that Juror Six was aware of Defendant's relationship to a gang, this fact and the surrounding circumstances do not constitute substantial prejudice, and thus a new trial should not be ordered.

Exposure to extraneous news sources about a criminal defendant's case has long "been held to call a verdict into question."  Gov't of Virgin Islands v. Gereau, 523 F.2d 140, 150-51 (3d Cir. 1975) ("[W]here jurors consider evidence, in the form of either fact or opinion, which has not been introduced in court, the confrontation and counsel rights of an accused are obviated as regards the particular evidence received."); Parker v. Gladden, 385 U.S. 363, 364 (1966) Remmer v. United States, 347 U.S. 227, 229 (1954).  However, "'not every exposure to extra-record information about the case will require a new trial.'" United States v. Gilsenan, 949 F.2d 80, 97 (3d Cir. 1991) (quoting Gov't of Virgin Islands v. Dowling, 814 F.2d 134, 139 (3d Cir. 1987)).  Rather, the Third Circuit has identified six factors to determine whether extra-judicial information can be considered as having substantially prejudiced the jury:

> (1) [whether] the extraneous information . . . relates to one of the elements of the case that was decided against the party moving for a new trial; (2) the extent of the jury's exposure to the extraneous information; (3) the time at which the jury receives the extraneous information; (4) the length of the jury's deliberations and the structure of the verdict; (5) the existence of instructions from the court that the jury should consider only evidence developed in the case; and (6) whether there is a heavy volume of incriminating evidence.

United States v. Fumo, 655 F.3d 288, 307 (3d Cir. 2011) (citations and internal punctuation omitted); United States v. Canalichio, 952 F. Supp. 2d 763, 767 (E.D. Pa. 2013) (citing Fumo).[6]

---

[6]      Contrary to Defendant's argument, the facts here do not align with those cases in which courts have presumed prejudice.  See United States v. Resko, 3 F.3d 684, 695 (3d Cir. 1993) (citing Strickland v. Washington, 466 U.S. 668, 692 (1984) (prejudice presumed for actual or constructive denial of the assistance of counsel altogether); Penson v. Ohio, 488 U.S. 75, 86-89

"In examining for prejudice, [a court] must conduct an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." Id. at 304 (quoting United States v. Urban, 404 F.3d 754, 777 (3d Cir. 2005)). Once potential prejudice has been identified, "'the trial judge is obliged to investigate the effect of that exposure on the outcome of the trial.'" Id. (quoting United States v. Console, 13 F.3d 641, 669 (3d Cir. 1993)). The Court must determine whether "the allegedly prejudicial information influenced the jury 'when it deliberated and delivered its verdict'" because the relevant issue is the information's impact on the verdict and not the "information in the abstract." Urban, 404 F.3d at 777 (quoting Gilsenan, 949 F.2d at 95).

Apply the factors, I find that there is a substantial likelihood that the extrajudicial information learned by Juror Six prejudiced the jury. Juror Six discovered, at a minimum, Defendant's ties to a Trenton gang, and there is a strong possibility that she also learned that Defendant had been previously arrested on other charges. Although these facts were not related to any element of the charges, they fall within the category of evidence that is recognized as being prejudicial propensity evidence. Indeed, evidence of a criminal defendant's prior "bad acts" is specifically excluded under the Federal Rules of Evidence, and is admissible in only limited circumstances, none of which the Government relied on this case. F.R.E. 404; see, e.g., United States v. Carter, 410 F. App'x 549, 552-53 (3d Cir. 2011) ("[W]e emphasize that gang-affiliation evidence should be admitted only when it is solidly tied to some legitimate purpose other than a showing of a propensity to criminal conduct such as one or more of those specified in Rule 404(b): motive, identity, opportunity, and the like."); United States v. McKay, 431 F.3d

(1988) (prejudice presumed where defendant's appointed appellate counsel failed to follow prescribed procedures before withdrawing from representation); Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980) (prejudice presumed where defendant's attorney had an actual conflict of interest)). Accordingly, I apply the test enunciated in Fumo to determine whether Defendant was prejudiced in this case.

1085, 1093 (8th Cir. 2005) ("[G]ang affiliation evidence is not admissible where it is meant merely to prejudice the defendant or prove his guilt by association with unsavory characters . . . ."). This type of evidence is highly inflammatory and knowledge of a criminal defendant's involvement with a well-known gang could only make it more likely for a juror to believe that the defendant committed a crime such as the ones at issue here—possession of a firearm. See Carter, 410 F. App'x at 553 (describing evidence of defendant's gang affiliation as "potentially volatile"); see also United States v. Bradford, 246 F.3d 1107, 1117 (8th Cir. 2001) ("To be certain, there is great potential for prejudice when evidence regarding gangs is at issue."). Moreover, while exposure to extrajudicial information may have been brief,[7] the nature of the extrajudicial information is such that even brief exposure raises a high possibility of prejudice. Thus, I find that this first factor weighs in favor of a finding of prejudice that would support granting a new trial.

The lack of overwhelming incriminating evidence in the case also supports a finding of prejudice. To be sure, the evidence was not so lacking that it clearly would have been appropriate for the Court to rule on Defendant's Rule 29 motion, for acquittal based on sufficiency of the evidence, at the close of the Government's case-in-chief. Nevertheless, to borrow a particularly apt colloquialism, there was no "smoking gun" in the Government's case. Instead, the Government relied almost entirely on testimony from only two of the four arresting police officers.[8]   See, e.g., Trans. Sept. 16, 2013, T64-T71 (Testimony of Det. Asbury) (testimony regarding his arrest of Defendant); id. at T141-T147 (Testimony of Det. Constance)

---

[7]   As the Court has already found that Juror Six was not fully credible is describing how many times she conducted research of Defendant, it may well be that the exposure was more than just brief.

[8]   Beyond these two witnesses, the Government only called one additional witness, Special Agent Greco, on the element of whether the firearms identified in the indictment had travelled in interstate commerce.

(same).  These two witnesses could not testify to a certainty that they saw Defendant physically holding any of the firearms listed in the indictment; rather, the substance of their testimony focused on their observations—in a dark alley at night, approximately twenty-plus feet away—on Defendant's proximity to locations where the firearms were ultimately discovered.  See, e.g., id. at T109 (Testimony of Det. Astbury) (testifying that he was approximately 40-50 feet away from area where he believed Defendant had been holding a shotgun that was later discovered in the bushes); id. at T116 (clarifying previous testimony that he never actually saw or found a handgun in bushes or on Defendant, despite testifying previously he believed he saw one on Defendant from afar).  In that connection, there was no forensic examination done of the weapons retrieved, and thus no fingerprints or other evidence connecting Defendant to physical possession of the weapons listed in the indictment.  See id. at T119:2-11 (Testimony of Det. Astbury) (explaining that no forensic analysis was done, but that, in any event, the Trenton Police handled this aspect of the arrest procedures); id. at T131:10-22 (same for DNA processing).  In sum, the entirety of the Government's case turned on the eye-witness identification of Defendant by two officers.  And although such evidence may, under normal circumstances, be sufficient to find guilt beyond a reasonable doubt, when coupled with the extrajudicial information learned by Juror Six, there is less certainty that Defendant's conviction was based solely on the evidence presented by the Government.  Cf. United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993) (holding that "[a]ny claim of prejudice is further undermined by the volume of incriminating evidence presented by the government during the remainder of the trial").

        The jury's short deliberations—within the span of an afternoon—and the fact that the jury rendered a split verdict between the two counts is not determinative of whether the

extrajudicial information should be considered prejudicial. As noted, this was not a complicated case; the Government's case-in-chief spanned less than one and one-half days, and the defense only one-half day. The jury's short deliberations are to be expected, even if there was some debate among the jurors regarding the strength of the Government's case. With respect to the split verdict, in most circumstances this tends to indicate that the jury carefully considered and weighed the evidence. And here there certainly was more testimony from Government witnesses supporting the first charge in the indictment than there was for the second charge. Yet, I cannot be sure that the jury based its verdict solely on the evidence presented at trial. The nature of the information learned by Juror Six may have caused her to side with the other jurors—to convict on the first charge—when she may not otherwise have agreed with such a verdict had she not been exposed to extrajudicial information. Similarly, I am not convinced, because of Juror Six's inconsistent testimony in the in camera interview, that she did not share some or all of the extrajudicial information with the other members of the jury. In my view, there exists an equally reasonable possibility that the jury as a whole knew of Defendant's gang connections and other arrests, and—with knowledge of this extrajudicial information—could have based their decision to convict on a generalized feeling that Defendant was a career criminal or "bad" person, rather than on the evidence presented in the case. Thus, I find that these factors neither way for or against a finding of prejudice.

Finally, two factors militate against a finding of prejudice: (i) the timing of when the extrajudicial information was learned—i.e., at the beginning of the case, and (ii) the instruction given by this Court, in charging the jury, to consider only the evidence presented in the case in reaching a verdict. Generally, the discovery of extrajudicial information at the outset of a trial, when followed by several days worth of evidence, coupled with either a curative or preemptive

11

charge to the jury to consider only evidence—which the jury is presumed to follow—minimizes any potential prejudice.  United States v. Thornton, 1 F.3d at 156 (citing United States v. Gilsenan, 949 F.2d at 96).  But it bears noting that the information may have particularly resonated with Juror Six, since she repeated it in detail in her internet posting following trial—*i.e.*, the information was not forgotten.

Considering all these factors leads me to conclude that there is a substantial likelihood that the extrajudicial information learned by Juror Six "influenced the jury when it deliberated and delivered its verdict."  Urban, 404 F.3d at 777 (internal quotation marks omitted).  The nature of the information learned, the possibility that this may have been considered by one juror or shared and considered by all jurors, and the relative strength of the Government's case all weigh in strongly in favor of a finding of prejudice.  Put differently, under the circumstances of this case, I find that there is a reasonable possibility that Juror Six's conduct is a "trial error [that] had a substantial influence on the verdict."  United States v. Mastro, 570 F. Supp. 1388, 1390 (E.D. Pa. 1983); Government of Virgin Islands v. Bedford, 671 F.2d 758, 762 (3d Cir. 1982)).  Accordingly, for these foregoing reasons, a new trial must be granted.

## IV.     CONCLUSION

For the reasons stated above, Defendant's Rule 33 motion is granted.  Defendant's conviction is vacated and a new trial is granted.  An order will be entered consistent with this Opinion.

Dated: June 12, 2014                                  /s/    Freda L. Wolfson
                                                      Honorable Freda L. Wolfson
                                                      United States District Judge

12